NOTICE

Decision filed 04/15/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230586-U

NO. 5-23-0586

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Vermilion County. |
| | ) | |
| v. | ) | No. 21-CF-30 |
| | ) | |
| JAEVIN GRIGGS, | ) | Honorable |
| | ) | Derek J. Girton, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justices McHaney and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The defendant's convictions are affirmed where the evidence was sufficient to find the defendant guilty beyond a reasonable doubt and the proximate cause theory of felony murder did not violate the defendant's rights. The defendant's right to due process was not violated and the defendant's claim regarding judicial estoppel is without merit. The trial court did not abuse its discretion by failing to allow a prior consistent statement. Finally, trial counsel was not ineffective.

¶ 2    Following a jury trial, the defendant, Jaevin Griggs, was found guilty of one count of first degree felony murder causing the death of Wyatt Bailey (720 ILCS 5/9-1(a)(1) (West 2018)), one count of first degree murder causing the death of Clayvonte Sloan (720 ILCS 5/9-1(a)(3) (West 2018)), and one count of armed robbery (720 ILCS 5/18-2(a)(2) (West 2018)). The jury also found that the defendant discharged the firearm that caused the deaths of these individuals. The defendant was sentenced to the Illinois Department of Corrections for two consecutive 20-year terms for each of the first degree murder convictions. On appeal, the defendant alleges the following: (1) the State

1

failed to prove the defendant guilty beyond a reasonable doubt, (2) trial counsel was ineffective, (3) the trial court abused its discretion by prohibiting prior consistent testimony given by a witness at a co-offender's trial, (4) the State violated due process or was judicially estopped from impeaching a witness with a prior inconsistent statement, and (5) the application of the proximate cause theory of felony murder violated the defendant's due process and his rights under the eighth amendment. For the following reasons, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4       On January 16, 2021, Dustin Cooper contacted Wyatt Bailey to buy cannabis products from Wyatt Bailey via Snapchat messages. The following day, Cooper, the defendant, Camarion Halthon, Ali Bryant, and Clayvonte Sloan drove to Bailey's house in a gold Chevy Impala. During the attempted drug purchase, a shooting occurred that left Sloan and Bailey dead. No witnesses testified regarding the events that took place during the attempted drug purchase. Based upon the forensics, Sloan was shot and killed by Bailey's Glock handgun. Bailey was shot and killed by a Smith & Wesson handgun. When police stopped the Chevy Impala shortly after the shooting, Bryant was driving, Halthon was in the front passenger seat, the defendant was located in the rear seat behind the driver, Sloan was unconscious in the middle back seat, and Cooper was located in the rear seat behind the passenger, Halthon.

¶ 5       On February 4, 2021, the defendant was charged by indictment with several counts of first degree murder, only two of which are relevant to this appeal. Count IV charged the defendant with first degree felony murder in that the defendant "or one for whom he is legally accountable on or about the 17th day of January, 2021, in attempting or committing a forcible felony, Armed Robbery, Robbery or Mob Action," shot Sloan resulting in his death. Count V charged the defendant with first degree murder in that the defendant "or one for whom he is legally

2

accountable, on or about the 17th day of January, 2021, without lawful justification and with the intent to kill or do great bodily harm to Wyatt Bailey, shot Wyatt Bailey with a firearm, thereby causing the death of Wyatt Bailey." In addition to the first degree murder charges, count IX charged the defendant with armed robbery in that the defendant "while armed with a firearm, took property, being a firearm and United States currency, from the person or presence of Wyatt Bailey, by the use of force or by threatening the imminent use of force." The defendant's trial spanned several days, and the State called numerous witnesses. A recitation of the relevant testimony and evidence that was presented at trial follows.

¶ 6    The State called Natasha Bailey, Wyatt Bailey's mother. Natasha testified that she and her boyfriend, Jason Hicks, kept six guns in their home. Wyatt Bailey lived in the guest house located on her property. One of those guns was a .40 caliber Glock that was kept in the guest house where Wyatt lived. She stated that she gave the gun to Wyatt but did not purchase the extended magazine that was later found with the gun. Natasha stated that she was in her bedroom at approximately 2:45 p.m. on January 17, 2021, when she heard three loud noises that sounded like gunshots. She "jumped up" and went over to the window. She saw the "back of a like a silver, gold car with the back passenger door open." Shortly afterward, she became aware that Wyatt had been shot in the chest and was lying outside of her house. She ran to his aid and stayed with him until the ambulance arrived. She went with Wyatt to the hospital, but he did not survive his injuries.

¶ 7    Adriana Bloomfield, Wyatt Bailey's girlfriend, and Brendan Cunningham, a friend of Bailey, also testified for the State. Both were present in the guest house when Wyatt Bailey was shot. Bloomfield testified that Bailey sold marijuana through Snapchat by posting pictures or videos of his merchandise and communicating with buyers through the app.

¶ 8    On January 17, 2021, Bloomfield and Bailey were together in the morning. Bailey called Cunningham, who lived a couple of doors down from Bailey, and asked Cunningham to come over. Bloomfield noticed that Bailey was communicating via Snapchat with Dustin Cooper. Bloomfield knew Cooper from school when they were younger. She saw that Cooper wanted to purchase marijuana from Bailey. After a few minutes, Bailey put his marijuana products into a black bag and took a video of its contents with his phone. Bailey put his phone down, grabbed the bag, and walked out of the guest house. Bloomfield noticed the outline of Bailey's gun in the front pocket of his sweatshirt as he left. During her testimony, Bloomfield identified a photo of Bailey holding the gun she saw in the outline of his pocket. Approximately, one minute after Bailey left, Bloomfield heard gunshots. She ran to the main house and told Bailey's mom to call 911. Bloomfield then went outside and saw Bailey lying on his back on the lawn next to the road. She observed two bullet holes in Bailey's sweatshirt and that his sweatshirt pocket had been ripped. Bloomfield noticed that Bailey's gun and the black bag were missing. When police arrived at the scene Bloomfield told them that Cooper was selling marijuana to Bailey in an attempt to protect Bailey. Following the shooting, Bloomfield and Cunningham took Bailey's phone, keys, and wallet to Cunningham's house.

¶ 9    Cunningham testified he was still at the guest house when he heard gunshots. He stated that he ran outside after hearing the gunshots and saw Bailey on the ground. He saw a Chevy Impala driving away from the scene. As the Impala drove away, Cunningham stated that the car "just had its rear passenger door was open, as it was going."

¶ 10    Neighbors Vicki Haden, Taylor Martin, and Therea Long were all called to testify. Haden stated that on January 17, 2021, she heard three gunshots and saw a gold Impala turn "in on my property." She saw a passenger window go down and a dark-skinned hand throw a "gun in the

4

woods." She believed that this window was the "front passenger window." Martin testified that she witnessed "an older style gold Chevy Impala" that went around her block "a good three times." Martin noticed that "the back right passenger door was open." Long testified that investigators with Vermilion County Sheriff's office came to her house to ask her about her security system and whether or not it was recording. She checked the system and it was recording on the day of the incident. She had two motion activated cameras that were positioned around her home that also showed the street in front of her house. The various video clips that the State played at trial were grouped into one video and entered into evidence as "People's 3." They showed the gold Chevy Impala driving around Long's neighborhood before the shooting. The videos also showed the gold Chevy Impala driving past Long's home and away from the scene of the shooing.

¶ 11     Vermilion Sheriff's Deputy Cody Steeples testified that while on patrol he received a call regarding a shooting and a possible gunshot victim. Steeples received additional information that "a gold older model or older body style Chevy Impala" might be involved as the suspect vehicle. On his way to the call, Steeples noticed a car that matched the vehicle's description. He pulled the car over and began giving commands for the occupants of the vehicle to "show me their hands." The back-rear passenger began yelling out the window that someone was shot inside the vehicle and that they needed help. Steeples approached the vehicle and began evaluating the individual who was located in the back middle seat with what appeared to be blood on him, when he noticed a firearm located on the backseat floorboard "hump" behind the driver's seat. This was a Glock firearm with an extended magazine, that was later determined to belong to Bailey. Steeples secured the firearm by placing it on the roof of the Impala. Steeples asked the occupants in the car if there were any more firearms located in the car, to which they replied "yeah." After searching the floorboard under the driver's seat, Steeples removed another firearm that was a semi-automatic

5

handgun with a gray handle. He placed that gun on the roof of the Impala. The State provided Steeples with pictures of the occupants to confirm their identity and respective seat positions in the car. Steeples identified Bryant as the driver, Halthon as the front seat passenger, the defendant as the rear driver side passenger, and Cooper as the rear passenger on the passenger side. Steeples stated that at some point he learned that Sloan was the identity of the unconscious middle passenger. Steeples also identified the defendant in court.

¶ 12    Captain Michael Hartshorn, with the Vermilion County Sheriff's Department, testified that he went to the scene of the stopped Impala. There he collected two firearms that had been recovered by Steeples. One was a Glock with a 29-round magazine, and another was a 9-millimeter Polymer 80 with 16 live rounds.

¶ 13    Illinois State Police crime scene investigator Robert Telford processed the gold Chevy Impala that was towed and secured from the scene. During his inspection, he found and collected a black bag located on the rear floorboard under the front passenger seat. The bag contained cannabis products and vape cartridges. Telford also found counterfeit currency on the rear floorboard, and a bullet located near the seatbelt of the rear passenger side of the backrest. He also swabbed for what appeared to be gunshot residue (GSR) on the driver's door.

¶ 14    Brandi Field, an Illinois State Police crime scene investigator, testified that she processed a "ravine area." She was told that some occupants "had thrown an object into the woods." Field retrieved a Smith & Wesson handgun from the ravine that later tested positive for blood near the barrel of the firearm. Field also processed the scene outside of Bailey's residence. She found two shell casings and one projectile that she dug out of the ground. In addition, she recovered one projectile during the defendant's autopsy. Forensic scientist and DNA expert Jennifer Acosta-Talbot testified that the defendant's DNA was not found on any of the three recovered firearms.

6

¶ 15    Firearms' expert Kelly Panunzio tested the bullet recovered from the back seat area of the Impala and determined it was fired by the recovered Glock handgun. The bullet dug out of the ground from the scene of the shooting was fired by the Smith &Wesson. A bullet recovered from Bailey's leg during his autopsy was consistent with being fired by the Smith & Wesson.

¶ 16    Forensic pathologist Shiping Bao performed Sloan's autopsy. Bao testified that Sloan died of a single gunshot wound that entered his lower abdomen, perforated a major vein, and exited his right buttock.

¶ 17    Forensic pathologist Scott Denton rendered his expert opinion that Bailey had three gunshot wound entries and a fourth reentry wound. The two wounds near Bailey's hip indicated that the shots were fired from close range, but Denton could not say if the wound came from one gun or two. The bullet that caused one of these two wounds severed the femoral artery and exited right above the knee. The other bullet reentered Bailey's left leg where it was lodged and later removed. Bailey additionally suffered an entrance wound to his chest.

¶ 18    Shan Mei-Jones was an expert in gunshot residue (GSR). Mei-Jones concluded that the swab taken from the Impala by Telford was positive for primer gunshot residue (pGSR).[1] Mei-Jones also analyzed samples taken from the hands of Halthon, Bryant, Cooper, and the defendant. Mei-Jones concluded that the samples taken from the hands of the defendant were positive for pGSR. She opined that either the defendant "discharged a firearm, contacted a pGSR-related item or had both hands in the environment of a discharged firearm." Mei-Jones stated that "all three of them are equally possible." Bryant and Cooper additionally tested positive for pGSR. Mei-Jones concluded that Halthon's sample was negative for pGSR.

---

[1]Mei-Jones explained that when a firearm is discharged, there are particles expelled from the opening, which consist of lead, barium and antimony. These elements are characteristic of "primer gunshot residue also known as pGSR."

¶ 19    There were two cell phones recovered from the scene in front of Bailey's home. The State called patrol sergeant Kyle Smitley, and former Deputy Arik Bruens who were both employed by the Vermilion County Sherrif's Department. Smitley responded to the scene of the shooting after receiving a call of a gunshot victim. Smitley testified that when he arrived at the Bailey's residence, he was "approached by an individual who handed over two cell phones to me." Smitley did not know who the individual was but secured the phones as evidence. Bruens stated that he reviewed data that was extracted from a cell phone that was found near Bailey's body. He saw over "30 photos and approximately 5 videos" of Bryant holding a gun that appeared to be at least visually consistent with the Polymer 80 that was recovered from the gold Chevy Impala.

¶ 20    The State additionally called former Vermilion County Sheriff's Department Investigator Jesse Roach. He testified that he obtained and reviewed Snapchat records from Bailey's phone that were tied to Bailey from before the shooting on January 17, 2021. Roach identified videos of cannabis products posted for sale and explained messages between Bailey and Cooper that discussed the purchase of cannabis and vape cartridges. On January 17, 2021, at 2:13 p.m., there was a message regarding Cooper purchasing weed and vape cartridges from Bailey. This message was just prior to the shooting. A video from January 17, 2021, taken at 2:41 p.m. of the inside of the bag, showed cannabis items which matched the evidence in the bag found in the gold Chevy Impala.

¶ 21    After the State rested, the defense moved for a directed verdict. Defense counsel argued that the only evidence against the defendant was a positive GSR result. This meant that the defendant was merely in the presence of a discharged firearm. Defense counsel further argued that merely because the defendant was in a vehicle where individuals were engaged in illicit activity,

did not mean that the defendant was in agreement with what the other individuals had planned. The trial court denied the motion.

¶ 22    The defendant called only one witness, Jonathan Ventura. Ventura testified that he was a neighbor that lived across the street from Bailey. On the day of the shooting, Ventura was outside smoking when he noticed a "goldish Impala." After watching the car circle the block a few times, he went inside his home. Ventura stated that he "heard a horn a couple of times" and then he heard "about maybe four or six shots." He looked outside and saw the driver running back into the driver's seat and that when the car drove away, the passenger rear door was still open. Ventura stated that the driver was wearing a gray sweatshirt. On cross-examination, the State asked Ventura about a statement that he gave to Captain Hartshorn at the scene of the shooting. In this statement, Ventura said that "the driver's rear passenger was trying to get in the car as the car was moving." Because this statement regarding the driver's rear passenger trying to get into the car was different than his testimony that it was the rear passenger door that was open, the State used this prior statement to impeach Ventura. On redirect, defense counsel asked Ventura about a prior statement that he had given when he testified before a jury "regarding a different matter." Defense counsel was referencing Ventura's testimony at the trial of Cooper, who had also been charged as a result of Bailey's death. Following the State's objection, and outside the presence of the jury, defense counsel argued that Ventura's statement from Cooper's trial regarding which door was open when the car drove off was a prior consistent statement, as it was the same testimony given at the defendant's trial. The State argued that the prior consistent statement was inadmissible. The trial court sustained the State's objection and instructed the jury to "disregard anything regarding that question about possible testimony at an earlier hearing or what the answer to that question would have been."

9

¶ 23   The defense rested and the State called Captain Hartshorn in rebuttal to introduce Ventura's recorded statement that he gave to police on the day of the shooting. The State played two audio recorded clips for the jury. In the first clip, Ventura said "the driver's rear passenger was trying to get in the car as the car was moving." In the second audio clip, Ventura agreed that the rear driver's side door was open and that he "would have been able to see someone getting in the car." On cross-examination, Hartshorn said that Ventura told him that the person getting back into the vehicle was wearing a gray hoodie. Hartshorn stated that the only person he knew of wearing a gray hoodie that day was Bryant. On redirect, the State introduced a photograph of the defendant and Hartshorn agreed that it accurately depicted the defendant wearing a dark hoodie. Defense counsel on recross examination introduced a photograph of Bryant and Hartshorn agreed that the photograph depicted Brant in a gray hoodie and not a dark hoodie. The State then rested.

¶ 24   In closing arguments, the State argued that this was a planned robbery. Cooper set up a transaction over the span of two days to ensure that the "juice would be worth the squeeze." The State argued that following a scuffle between Bailey and the individuals from the Impala, the group of individuals executed Bailey and that the defendant was one of the shooters. Among the evidence that the State relied on was the GSR found on the defendant's hands, the prior inconsistent statements made by Ventura stating that an individual got back into the Impala on the rear driver side door, and that the Polymer 80 firearm was found at the feet of the defendant. The State told the jury that it could find the defendant guilty directly or through the accountability theory for the murder of Bailey. In addition, the State argued that the death of Sloan could be attributed to the defendant under the felony murder charge either directly or by the accountability theory.

¶ 25   Defense counsel argued in his closing that the defendant was present at the murder but was in the wrong place at the wrong time. There was no evidence that showed the defendant knew

10

about the robbery. Defense counsel highlighted that the phones found at the scene of the shooting belonged to Cooper and Bryant. Further, defense counsel argued that Cooper threw the Smith & Wesson into the ravine and that Bryant had many pictures of him with the Polymer 80 firearm, thereby demonstrating Bryant's ownership of the gun. In addition, defense counsel argued that Bryant had a wound on his head from a scuffle prior to the shooting of Bailey. Finally, the videos showed that Cooper's rear passenger door was open as the Impala drove off.

¶ 26    The jury found the defendant guilty of first degree murder of Bailey and Sloan. The jury additionally found that the defendant personally discharged a firearm that proximately caused great bodily harm or death to Bailey. The defendant was also found guilty of armed robbery.

¶ 27    In a motion for a new trial, the defendant argued, among other things, that the trial court erred by prohibiting the defense from rehabilitating Ventura with his prior consistent statement given at Cooper's trial. The trial court denied the defendant's motion and sentenced the defendant to the Illinois Department of Corrections for two consecutive 20-year terms for each count of murder. The trial court declined to impose a firearm enhancement due to the defendant's youth. The defendant now appeals.

¶ 28                                    II. ANALYSIS

¶ 29    On appeal, the defendant first claims that the State failed to prove the defendant's guilt beyond a reasonable doubt for first degree murder under any theory because the evidence was insufficient. Second, the defendant claims that trial counsel was ineffective for calling Ventura to testify, as this testimony was unnecessary and opened the door for the State to introduce Ventura's prior inconsistent statement. Further, trial counsel was ineffective where he failed to prove that Dustin Cooper's phone was found at the scene, which would have bolstered the defense theory that it was Cooper who was out of the car at the scene of the shooting. Third, the defendant claims

11

that the trial court erred when it prohibited the defense from rehabilitating Ventura with his prior consistent testimony given at Cooper's trial. Fourth, the defendant claims that the State violated his right to due process by allowing the State to impeach Ventura in the defendant's trial while relying on the veracity of Ventura's testimony used for impeachment in Cooper's trial. The defendant concedes that defense counsel did not object at trial, and requests that this court review the use of Ventura's inconsistent testimony under first prong plain error or ineffective assistance of counsel. Finally, the defendant claims that the proximate cause theory of liability used against the defendant in his conviction for the murder of Clayvonte Sloan is unconstitutional as applied to the defendant because it lacks an applicable *mens rea*, creates a mandatory, irrebuttable presumption of guilt, and results in cruel and unusual punishment. We consider each of the defendant's arguments in turn.

¶ 30                              A. Sufficiency of the Evidence

¶ 31    The defendant first claims that the State failed to produce sufficient evidence to find the defendant guilty beyond a reasonable doubt for the first degree murder of Bailey with the intent to kill and failed to prove him guilty for the first degree felony murder of Sloan. When a defendant challenges the sufficiency of the evidence, a reviewing court must view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. It is not the task of a reviewing court to retry a defendant. *Gray*, 2017 IL 120958, ¶ 35. Thus, the reviewing court will not replace the judgment of a trier of fact on the issues of the credibility of witnesses, the weight of the trial evidence, the reasonable inferences from the evidence, and the resolution of the conflict of the evidence. *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 52. A conviction will not be reversed unless the evidence is "so unreasonable, improbable, or

12

unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 52.

¶ 32                                    i. Murder of Bailey

¶ 33    The defendant attempts to argue on appeal that the evidence was insufficient to prove the defendant guilty beyond a reasonable doubt for the first degree murder of Bailey under any theory charged by the State. In this case, the State charged the defendant with multiple counts of murder for the death of Bailey. Counts V-VIII alleged different theories of first degree murder under the statute. See 720 ILCS 5/9-1(a) (West 2018). The jury, however, issued a general verdict finding the defendant guilty of the first degree murder of Bailey.

¶ 34    When a general verdict is rendered and the charges against the defendant involve the death of only one individual, our Supreme Court follows the "one good count rule." See *People v. Lymore*, 25 Ill. 2d 305 (1962). "Under such circumstances only the conviction for the most serious charge of murder will be upheld, and the convictions on the less serious charges of murder are to be vacated." *People v. Cardona*, 158 Ill. 2d 403, 411 (1994). Therefore, "when an indictment alleges various forms for a single murder—intentional, knowing or felony murder—and a general verdict is returned, the net effect is that the defendant is guilty as charged in each count and there is a presumption that the jury found that the defendant committed the most serious of the crimes alleged, which is intentional murder." (Internal quotation marks omitted.) *People v. Perry*, 2011 IL App (1st) 081228, ¶ 56. Under the one good count rule, "[w]here but one person has been murdered, there can be but one conviction of murder; when multiple convictions are obtained for offenses arising out of a single act, sentence is imposed on the most serious offense." *Cardona*, 158 Ill. 2d at 411. The trial court sentenced the defendant on count V, which alleged the defendant

13

committed the act of intentional murder as to Bailey. Therefore, we consider only whether the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt under count V.

¶ 35    In count V of the indictment, the State charged that the defendant, "or one for whom he [was] legally accountable, on or about the 17th day of January, 2021, without lawful justification, and with the intent to kill or do great bodily harm to Wyatt Bailey, shot Wyatt Bailey with a firearm, thereby causing the death of Wyatt Bailey in violation of 720 ILCS 5/9-1(a)(1)." An intent to kill can be inferred from the act of firing a gun at an individual. *Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 58. "Because intent is a state of mind, it can rarely be proved by direct evidence." *People v. Williams*, 165 Ill. 2d 51, 64 (1995). Instead, a defendant's intent to kill may be inferred from the surrounding circumstances, including the character of the attack, the use of a deadly weapon, and the nature and extent of the injuries inflicted. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 59.

¶ 36    The defendant claims that the State offered insufficient evidence to prove that the defendant was guilty of first degree murder with the intent to kill Bailey. Here, the State produced evidence that the defendant was in a gold Chevy Impala with four other individuals who went to purchase marijuana products from Bailey. There was video evidence and witness testimony that indicated the Impala had circled the block of Bailey's home several times before stopping. The exact circumstances involved in the drug transaction were not testified to by any witness. Nevertheless, the circumstantial evidence indicates that at some point during the drug transaction, Bailey was shot. He died from his injuries. Following the shooting, police pulled over the gold Chevy Impala and recovered two guns, counterfeit currency, and the bag of marijuana products that had been identified as being in Bailey's possession when he left the guest house. One of the guns recovered from the Impala was a .40 caliber Glock that was later determined to belong to Bailey and the other

14

was a Polymer 80. This gun was subsequently identified as belonging to Bryant, the driver of the Chevy Impala. The defendant was located in the back seat behind the driver, with these guns in close proximity to his feet.

¶ 37    Police additionally recovered a Smith & Wesson handgun from a nearby ravine that had been thrown from the Impala by an individual inside the car. The expert testimony concluded that this weapon was also used to shoot Bailey and caused the death of Bailey. There was also witness testimony that indicated that after the shots were fired, the rear driver's side door of the Impala was open, as the Impala sped away from the crime scene. Other witnesses testified it was the passenger side rear door that was opened as the car left the scene of the shooting. The State also produced an expert witness who analyzed the defendant's hands and the inside of the Impala's door for any gunshot residue. The opinion given at trial concluded that pGSR was found in the gold Chevy Impala and on the hands of the defendant.

¶ 38    The defendant went with four individuals in the car to the anticipated drug buy. Several guns were also brought along—a Smith & Wesson and a Polymer 80. The evidence was overwhelming that the defendant was present when the shooting occurred. The State's theory of the case was that Bailey shot first and struck Sloan, who was seated next to the defendant in the back seat of the Chevy Impala. Shots were returned, which struck Bailey. The Smith & Wesson which caused Bailey's death was thrown from the Chevy Impala after the crime. Although the circumstantial evidence suggested that the Smith & Wesson was thrown from the passenger side of the Impala, there was no evidence regarding who owned the gun. DNA testing did not determine ownership of the Smith & Wesson. Throughout these events, the defendant was present and participated in the continuation of the criminal activity. Importantly, Bailey's gun, which caused the death of Sloan, was found in the Impala when it was pulled over immediately after the shooting.

15

This gun was located at the feet of the defendant on the floorboard of the backseat. The State's expert opined that the defendant had gunshot residue on his hands. Therefore, we find that the State produced sufficient evidence for the trier of fact to find the defendant guilty of the first degree murder with the intent to kill Bailey beyond a reasonable doubt.

¶ 39　The defendant additionally claims that the State failed to provide sufficient evidence to find the defendant guilty of the first degree murder of Bailey under any theory of accountability.[2] Concerning whether the defendant was accountable for the murder of Bailey, we first consider the statute, which states, in relevant part,

> "A person is legally responsible for the conduct of another when: (c) either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense. When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts. Mere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability." 720 ILCS 5/5-2(c) (West 2022).

An individual may be found guilty on an accountability theory if the State establishes, beyond a reasonable doubt, that the defendant "either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." *People v. Perez*, 189 Ill. 2d 254, 266 (2000). To prove that a defendant intended to promote or facilitate the crime, the State must present evidence that the defendant either shared the criminal intent of the principal, or that there was a common criminal design. *Perez*, 189 Ill. 2d at 266. "Presence during the crime without

---

[2]The State charged the defendant with first degree murder, alleging that the defendant, "or one for whom he [was] legally accountable, on or about the 17th day of January, 2021, without lawful justification, and with the intent to kill or do great bodily harm to Wyatt Bailey, shot Wyatt Bailey with a firearm, thereby causing the death of Wyatt Bailey in violation of 720 ILCS 5/9-1(a)(1)."

16

dissociating oneself from the crime, continued association with the perpetrator after the criminal act, and flight from the crime scene all serve as factors in determining a defendant's accountability." *People v. Mullen*, 313 Ill. App. 3d 718, 725 (2000). In other words, factors that the trier of fact may consider in determining the legal accountability of a defendant include the defendant's presence, the defendant maintaining a close affiliation with his companions after the commission of the crime, and the defendant's failure to report the crime. *People v. Cox*, 2023 IL App (1st) 170761, ¶ 62.

¶ 40   Here, we find there was sufficient evidence presented by which the jury could, under a theory of accountability, convict the defendant of the offense of murder committed with the intent to kill or to do great bodily harm. As previously noted, the evidence is clear that when the five individuals in the gold Chevy Impala, which included the defendant, met up with Bailey, there were guns in the car. Shortly after meeting up with Bailey, shots were fired. The Chevy Impala fled the area where the shooting occurred. Witnesses gave a description of the car and saw an object thrown from the Impala. This object was recovered and identified as a Smith & Wesson handgun that was used to cause the death of Bailey. In the meantime, Sloan had also been shot and was bleeding from his wounds in the backseat, next to the defendant. Throughout this entire sequence of events, there is no indication that the defendant attempted to get out of or leave the Chevy Impala; he did not seek help for Sloan; he did nothing to assist Bailey; and he did not report the crime to the police. Instead, he, along with the other occupants of the Impala, fled the scene in an attempt to avoid being caught. The guns that were found in the area near his feet in the backseat included Bailey's gun which had to have been taken from Bailey at some point during the drug transaction. From this evidence a jury could conclude that it was the defendant who was out of the car and who was accountable for the death of Bailey under the first degree murder charge that

17

alleged an intent to kill. Therefore, we find that the State's evidence was also sufficient to convict the defendant of first degree murder with the intent to kill or do great bodily harm to Bailey under the accountability theory beyond a reasonable doubt.

¶ 41                                    ii. Murder of Sloan

¶ 42    In count IV, the defendant was charged with the felony murder of Sloan, who was actually shot by Bailey during the drug transaction while Sloan sat in the back seat of the gold Chevy Impala. The defendant claims that the State did not offer sufficient evidence to find that a forcible felony was planned and if there was, that there was no evidence that the defendant knew or participated in it.

¶ 43    The State alleged that the defendant, "or one for whom he is legally accountable on or about the 17th day of January, 2021, in attempting or committing a forcible felony, Armed Robbery, Robbery or Mob Action, in violation of 720 ILCS 5/18, or 5-18-1, or 5/25 shot C.S. (Sloan) DOB: 3/22/2005 with a firearm thereby causing the death of C.S. (Sloan) DOB: 3/22/2005, in violation of 720 ILCS 5/9-1(a)(3)." Simply put, the defendant was charged with the felony murder of Sloan. The State charged several predicate felonies, but the jury found that the defendant was guilty of armed robbery. Therefore, we begin our analysis with whether there was sufficient evidence to prove, beyond a reasonable doubt, that the defendant, or person for whom he was accountable, was guilty of an armed robbery, which caused the death of Sloan. In order to prove an armed robbery, the State was required to prove, beyond a reasonable doubt, that the defendant, or person for whom he was accountable, while armed with a firearm, knowingly took property of Bailey by the use of force or by threatening the imminent use of force. 720 ILCS 5/18-2(a)(2) (West 2018).

18

¶ 44     Here, the State established that the defendant was in the gold Chevy Impala with the group of individuals that went to purchase marijuana products from Bailey. Bloomfield, Bailey's then girlfriend, testified that she watched Bailey leave his guest house with a black bag that contained marijuana products. Just prior to leaving his house, Bailey had been exchanging Snapchats with Cooper who intended to purchase marijuana products from Bailey. Bloomfield noted that that when Bailey left the house with his bag of products, he had a gun in his front sweatshirt pocket. Once outside, shots were heard, and Bailey was found shot and left lying in front of his house, bleeding to death. A gold Chevy Impala was seen leaving the area of the shooting. Witnesses saw something thrown from the car into a wooded area and police recovered a Smith & Wesson gun that was later determined to have been used to shoot Bailey, causing Bailey's death.

¶ 45     The defendant was riding in the rear seat of the Impala, behind the driver, and was sitting next to Sloan, who had also been shot. The Chevy Impala was stopped fairly quickly after the shooting and police recovered the bag containing marijuana products that had previously been in Bailey's possession, Bailey's Glock handgun, a Polymer 80 handgun, and counterfeit money. A .40 caliber projectile that killed Sloan was later determined to have been fired from Bailey's Glock handgun.

¶ 46     The evidence presented proved that the defendant must have been present during the armed robbery of Bailey. The State's theory was that a scuffle ensued and Bailey shot his Glock into the Impala and hit Sloan. One of the car's occupants returned fire with the Smith & Wesson gun and hit Bailey. After Bailey was shot, at least one individual, if not more, got out of the Impala and took Bailey's bag of marijuana and his Glock handgun. As previously noted, these items were later found in the Chevy Impala, and Bailey's Glock was at the defendant's feet.

19

¶ 47    In addition, when the Impala was stopped, the defendant was sitting in the back seat behind the driver, and next to Sloan, who was mortally wounded. The defendant had remained in the gold Chevy Impala as it fled the scene of the shooting, and the defendant failed to withdraw from the criminal conduct or report the crime. There is no evidence in the record that the defendant made any effort to aid Sloan, prior to the police stopping the vehicle, even though Sloan was bleeding to death as he sat next to the defendant. Additionally, the State presented evidence that gunshot residue was found inside of the car and on the hands of the defendant. There was sufficient evidence for the jury to find that the defendant went with his friends to take Bailey's marijuana from him through the use of force. Further, there is overwhelming evidence that after Bailey was shot, the defendant got out of the Impala, retrieved Bailey's .40 caliber Glock handgun, and got back in the car, placing Bailey's gun at the defendant's feet. At least one witness saw the rear door on the driver's side of the car open as the Impala sped away from the scene, which would have corresponded with the seat where the defendant was sitting when the Impala was stopped by the police. Thus, there was sufficient evidence from which a jury could conclude that the Glock gun and the bag of marijuana could only have been found in the car if they had been taken from Bailey, by the use of force. The evidence was substantial that the defendant, or one for whom he was accountable, committed an armed robbery by taking Bailey's marijuana and his Glock through the use of force, beyond a reasonable doubt. Therefore, the evidence was sufficient that the defendant was guilty of armed robbery either directly or under the accountability theory.

¶ 48    Next, the State was required to prove that the defendant was legally accountable for the death of Sloan. The State alternatively charged the defendant with felony murder by claiming that either the defendant, "or person for whom he was legally accountable," committed the armed robbery which led to the murder of Sloan. To be accountable for the death of Sloan, the evidence

20

must show that the defendant promoted or facilitated the armed robbery, or that there was a common criminal design. *Perez*, 189 Ill. 2d at 266. As discussed previously, factors which can be considered to support a finding of accountability include presence during the crime without withdrawing from the criminal activity, continued association with the perpetrator after the criminal act, and flight from the crime scene. *Mullen*, 313 Ill. App. 3d at 725. Additionally, the defendant's continued association with his companions after the commission of the crime, and his failure to report the crime can be evidence of accountability. *Cox*, 2023 IL App (1st) 170761, ¶ 62.

¶ 49    For a defendant to be found guilty of felony murder, the essential question is whether the "decedent's death is the direct and proximate result of the defendant's felony." *People v. Dekens*, 182 Ill. 2d 247, 252 (1998). When a defendant's attempt to commit a forcible felony commences "a chain of events which were or should have been within his contemplation when the motion was initiated, he should be held responsible for any death which by direct and almost inevitable sequence results from the initial criminal act." *People v. Lowery*, 178 Ill. 2d 462, 467 (1997). It is irrelevant whether a defendant did not anticipate the exact sequence of events that followed his forcible felony, he is responsible for the consequences if his conduct precipitated the "decedent's death." *Lowery*, 178 Ill. 2d at 470.

¶ 50    In this case, we have already determined, as it relates to the armed robbery, that the amount of evidence produced by the State regarding the defendant's direct conduct or the conduct of others for which he was accountable, was very substantial. Without repeating all of the evidence as above, it is clear that the defendant was present in the Impala when Bailey approached the Impala. Although there is no evidence in the record regarding the exact circumstances of the initial encounter, the circumstantial evidence is clear that the defendant was present when Sloan was shot, and he was present when Bailey was shot. There is no evidence to suggest that the defendant

21

stopped to render aid to Bailey, who was left wounded, lying in front of his home. The circumstantial evidence proves that either the defendant, or someone he was with, got out of the car, retrieved Bailey's bag of marijuana products and Bailey's gun, and put them in the gold Chevy Impala. The car then sped away from the scene. Thus, the evidence is substantial that the defendant drove off with the other occupants in the Impala. After someone in the Impala threw the Smith & Wesson out of the car in an attempt to get rid of the weapon used to shoot Bailey, the vehicle continued to drive away from the general area of the shooting. The gold Chevy Impala was stopped shortly after it left the area where Bailey was shot. The defendant was located in the back seat, on the driver's side of the vehicle at the time the Impala was stopped. As previously noted, Bailey's bag of drugs that he carried when he left his guest house, counterfeit currency, and Bailey's Glock gun were all found in the Impala. Bailey's gun was located at the defendant's feet. Additionally, the State proved that the defendant had gunshot residue on his hands. Thus, the evidence proves beyond a reasonable doubt, that the defendant came to the drug buy with other individuals, there were guns present in the Impala before the meeting with Bailey, and there was counterfeit money found which could have been used to obtain the marijuana products. Consequently, under the circumstances, it was foreseeable that there could be shots fired during the armed robbery which could cause death or great bodily harm to the individuals involved. Indeed, Sloan was shot by Bailey during the encounter, and Sloan died as a result of these injuries.

¶ 51 The defendant knew that once Sloan and Bailey had been shot, a crime had occurred and the defendant did nothing to withdraw from the criminal activity. In fact, the defendant facilitated the criminal activity after the initial armed robbery by obtaining Bailey's gun and hiding it at his feet in the back seat of the Impala. The defendant rode with the others involved in the shooting of Bailey and Sloan in an attempt to flee the scene, leaving Bailey in the street, wounded and bleeding.

22

The defendant failed to contact the police and failed to get aid for Sloan. Taking all of the evidence in the light most favorable to the State, we find that any rational trier of fact could have found the essential elements of felony murder beyond a reasonable doubt.

¶ 52                              B. Proximate Cause Theory

¶ 53    The defendant claims that the proximate cause theory is unconstitutional as applied to him for the murder of Sloan. Notably, the defendant did not raise this issue in the trial court, however, where the evidentiary record is sufficient, the constitutionality of a statute as applied to the defendant may be challenged for the first time on appeal. *People v. Martin*, 2018 IL App (1st) 152249, ¶ 12. The constitutionality of a statute is a question of law, which is subject to *de novo* review. *People v. Gray*, 2017 IL 120958, ¶ 57.

¶ 54    The defendant claims the proximate cause theory, as applied to him, is unconstitutional because there is no proof that the defendant shared a mental state with Bailey, the individual who actually shot Sloan. Therefore, the defendant argues he was denied his right to due process because the theory allows for a murder conviction under circumstances where the State cannot show an applicable *mens rea* for the murder. The defendant continues his argument, claiming that the proximate cause theory creates an impermissible mandatory presumption of guilt for felony murder as long as the State proves the commission or attempted commission of an underlying forcible felony. Finally, the defendant concludes that his right to due process is violated because the same punishment is applied to one who committed intentional or knowing murder, as the individual who, as defendant claims, had no *mens rea*, and also violates the prohibition on cruel and unusual punishment.

23

¶ 55    Our Supreme Court has held that the proximate cause theory found in civil cases applies equally to a criminal case.[3] Therefore, as previously stated, when "a felon's attempt to commit a forcible felony sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, he should be held responsible for any death which by direct and almost inevitable sequence results from the initial criminal act." *Lowery*, 178 Ill. 2d at 467. In fact, the Illinois Supreme Court has specifically held that the proximate cause theory as applied to first degree felony murder is constitutional when a co-offender is killed by an intended victim of the underlying felony. *People v. Dekens*, 182 Ill. 2d 247, 252 (1998). Furthermore, felony murder obtains its mental state from the underlying intended offense. *People v. Jones*, 376 Ill. App. 3d 372, 387 (2007).

¶ 56    We have already found that the State provided sufficient evidence to find the defendant guilty of the underlying felony of armed robbery beyond a reasonable doubt. Under the proximate cause theory, the State was required to show that the defendant had the requisite *mens rea* for the underlying felony. Here, Sloan's death occurred during the commission of a forcible felony, the armed robbery of Bailey. It was foreseeable that Bailey might retaliate against the acts which precipitated or were a part of the commission of the armed robbery. Therefore, once the *mens rea* for the underlying forcible felony was proved, there was no violation of the defendant's due process rights by finding him guilty for any death that proximately resulted from the unlawful activity. See *Lowery*, 178 Ill. 2d 462. Furthermore, there is no mandatory presumption of guilt, as alleged by the defendant. Finally, because the proof required all of the elements of armed robbery, the required *mens rea* under the forcible felony was proven beyond a reasonable doubt as it related

---

[3]The defendant additionally notes that the Illinois legislature amended the felony murder statute five months after the defendant committed his acts to eliminate the proximate cause theory.

to the first degree felony murder of Sloan, therefore there is no violation of the constitutional prohibition against cruel and unusual punishment.

¶ 57    In sum, the defendant's argument that the application of the proximate cause theory in this case lacked a *mens rea* for first degree murder is without merit. The defendant's constitutional rights were not violated by the State's use of the proximate cause theory using the theory of armed robbery as the predicate felony.

¶ 58                              C. Ineffective Assistance of Counsel

¶ 59    The defendant claims that his counsel was ineffective in two instances. First the defendant claims that counsel called an unnecessary witness which allowed the State to introduce impeachment evidence on cross-examination that was damaging to the defendant's case. Second, the defendant claims that counsel was ineffective for failing to establish that Cooper's cellphone was found at the scene of Bailey's shooting which indicated that Cooper was the individual outside of the car, not the defendant.

¶ 60    A criminal defendant has a constitutional right to effective assistance of counsel at all stages of the proceedings as guaranteed by the sixth amendment. *People v. Brown*, 2017 IL 121681, ¶ 25. To establish an ineffective assistance of counsel claim, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that, "but for" counsel's deficient performance, the result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Simply put, two prongs make up the *Strickland* test: deficiency and prejudice. The defendant bears the burden of showing that both prongs of the Strickland test are proved. *People v. Morris*, 2014 IL App (1st) 130152, ¶ 32. In other words, the defendant must show deficient performance and that the deficient performance resulted in prejudice. *People v. Hughes*, 2012 IL 112817, ¶ 44. To prove that the defendant suffered prejudice, "the defendant

25

must show that, 'but for' counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011). We do not need to evaluate whether counsel's performance was deficient if we conclude that the defendant cannot show prejudice. *People v. Hale*, 2013 IL 113140, ¶ 17. Therefore, we first consider whether the defendant suffered prejudice as a result of his claims of ineffective assistance of counsel.

¶ 61    Here, the evidence against the defendant was overwhelming. As previously stated, two guns were found in the proximity of the defendant's feet, stolen items were recovered from the Impala that the defendant was riding in, police officer testimony was given that implicated the defendant as present during the shooting and armed robbery, and pGSR was found on the defendant's hands. During Ventura's direct testimony in the defendant's case-in-chief, he stated that he heard what sounded like gunshots, went outside, and saw that the passenger rear door of the gold Chevy Impala was "wide open" as the car was leaving the scene of the shooting. Ventura went on to state that the car stopped in front of his house so "that they closed the door." During cross-examination, the State then impeached Ventura's trial testimony when it introduced Ventura's statement that he gave to a responding officer on the day of the shooting. In this statement Ventura stated that "the rear door of the driver's side was opened" when the Impala left the scene. While these inconsistent statements may affect the credibility of Ventura, this fact alone does not negate the mountain of evidence against the defendant.

¶ 62    In addition, the defendant claims that trial counsel failed to prove that it was Cooper's cellphone that was found at the scene of Bailey's shooting. The State, however, produced evidence throughout the trial that implicated Cooper as a co-offender. Furthermore, the State conceded in closing arguments that Cooper's cellphone was found at the scene of the shooting. The fact that

26

Cooper's cellphone was found at the scene, however, does not mean that the defendant was any less culpable, as he may have been out of the car in addition to Cooper. Also, as previously discussed, there was sufficient evidence to prove the defendant was guilty beyond a reasonable doubt under the accountability theory.

¶ 63    We find that there was no prejudice to the defendant regarding the testimony of Ventura nor was there prejudice regarding trial counsel's failure to establish that Cooper's cellphone was found at the scene of Bailey's shooting. We find that the evidence associated with these claims would not have caused a different outcome in the defendant's trial as the evidence of guilt was overwhelming. Because we find that there was no prejudice, we do not need to address whether there was deficient performance by trial counsel. Therefore, we find that defendant's claim of ineffective assistance of counsel claim is without merit.

¶ 64                    D. Judicial Estoppel and Due Process Violation

¶ 65    The defendant also alleges that the State relied on Ventura's testimony that was given in Cooper's trial to convict Cooper, and a different version of events from Ventura to convict the defendant. In Cooper's trial, the State relied on Ventura's testimony that the rear passenger door was open as the Impala fled the area. In the defendant's trial, as previously described, the State impeached Ventura, who admitted that after hearing gunshots, he saw the gold Impala driving away with the rear driver's side door open. The defendant claims the State's use of these two, differing statements, violated his due process rights and that the State should have been judicially estopped from using Ventura's testimony to support two different theories to convict the defendant and his co-offender, Cooper. The defendant concedes that defense counsel did not object to either issue at trial and further asks this court to review the due process issue and judicial estoppel under

27

the first prong of the plain-error doctrine or, alternatively, the defendant alleges ineffective assistance of trial counsel.

¶ 66 An issue is forfeited on appeal where the defendant fails to object at trial when allegedly improper evidence is introduced. *People v. Hudson*, 228 Ill. 2d 181, 190 (2008). Forfeiture is a limitation on the parties and not the reviewing court. *People v. Acosta*, 2024 IL App (2d) 230475, ¶ 15. The plain-error doctrine allows a reviewing court to reach a forfeited error under two circumstances. *People v. Moon*, 2022 IL 125959, ¶ 20. First-prong plain-error review is appropriate when a "clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant." *Moon*, 2022 IL 125959, ¶ 20. Under second-prong plain error, review is warranted when a "clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Moon*, 2022 IL 125959, ¶ 20. In both circumstances, the defendant bears the burden of persuasion. *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

¶ 67 The first step in the plain error analysis is to determine whether an error occurred, however, this is merely a matter of convention and we may begin the analysis in any order. *People v. Dillard*, 2025 IL App (4th) 230739, ¶ 124. "[E]rrors reviewable under the first prong of the plain error rule are the type of errors that are subject to harmless error analysis, and a defendant must establish prejudice resulting from the error to excuse his forfeiture of such an error." *People v. Jackson*, 2022 IL 127256, ¶ 23. The defendant asks only for first prong plain-error review as to the State's introduction of Ventura's prior inconsistent statement.

¶ 68 The defendant claims Ventura gave testimony at Cooper's trial to indicate that it was Cooper who was out of the car during the encounter with Bailey. At the defendant's trial, the

28

defendant claims the State impeached Ventura with a statement that Ventura gave at the scene which suggested that it was the defendant who was out of the car during the encounter with Bailey. Ventura gave the following testimony at Cooper's trial:

> "Q. You went back outside. And when you ran back outside, what did you observe?
> A. The driver was running back into the driver's side and took off. When he took off, the passenger rear-side door was open, and stopped, essentially, right in front of my house to get that door closed, and then took off, and then turned left, which is east, on Covert, which is a dead end street, where they turned around and flew back down to Kelly, and out the back of the trailer park."

Ventura gave similar statements at the defendant's trial regarding this version of events, then the State cross-examined Ventura regarding his statements given at the scene. The testimony from Ventura during the State's cross-examination was as follows:

> "Q. Okay. And in that interview he asked you what you saw, correct?
> A. Yes.
> Q. And you said, I exited the house. They were just starting to take off. Driver's rear passenger was trying to get in the car as the car was moving. Correct?
> A. Correct."

¶ 69    The defendant claims that it was error where the State impeached Ventura with his prior inconsistent statement once defense counsel called Ventura as a witness. Under first prong plain-error review, the defendant must show first that an error occurred, and second, that the evidence was so closely balanced that the "error" alone threatened to tip the scales of justice against the defendant. As previously stated, the evidence produced at trial was overwhelming. The defendant had pGSR on his hands, two firearms were found in the proximity of the defendant's feet, and contraband resulting from the armed robbery of Bailey was recovered inside of the car where the defendant was seated following Bailey's shooting. Although Ventura could be deemed to have given conflicting testimony, we do not reweigh the facts of the case. Therefore, even if we had

29

found error, the evidence in this case was not closely balanced, and the State's introduction of a prior inconsistent statement alone, did not tip the scales of justice against the defendant.

¶ 70    The defendant further claims that trial counsel was ineffective because he failed to object when the State introduced Ventura's prior inconsistent statement. To sustain a successful ineffective assistance of counsel claim, a defendant must show deficient performance and that the deficient performance resulted in prejudice. *Hughes*, 2012 IL 112817, ¶ 44. To prove that the defendant suffered prejudice, he must show that 'but for' counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Lacy*, 407 Ill. App. 3d at 457. Again, we do not need to evaluate whether counsel's performance was deficient if we conclude that the defendant cannot show prejudice. *Hale*, 2013 IL 113140, ¶ 17.

¶ 71    Without further recitation of the evidence above, we find that the evidence against the defendant was overwhelming. Therefore, we find that the defendant has failed to show that there is a reasonable probability that the result would have been different if not for counsel's performance, *i.e.* not objecting to the State's impeachment of Ventura. Thus, we find that the defendant's ineffective assistance of counsel claim regarding counsel's failure to object to the introduction of the State's impeachment evidence is without merit.

¶ 72    The defendant additionally alleges that judicial estoppel should have applied to the State when it introduced Ventura's prior inconsistent statement. Simply stated, the defendant asserts that the State should not have been able to use Ventura's prior inconsistent statement as this created two different theories in the prosecution of two separate co-offenders which resulted in their convictions. Again, there was no objection from defense counsel at trial.

¶ 73    The defendant attempts to use the doctrine of judicial estoppel as an additional and alternative due process violation. Even if we found that judicial estoppel applied in this case, the

30

defendant cannot meet the requirements to establish error under the plain-error doctrine, nor can he meet the requirements as to the analysis for ineffective assistance of counsel. Previously, we found that the evidence was not closely balanced under a first prong plain error analysis as the evidence was not closely balanced, and the defendant was not prejudiced by trial counsel's performance. Therefore, we find that the defendant's claim regarding judicial estoppel is without merit.

¶ 74                    E. Ventura's Prior Consistent Statement

¶ 75    The defendant claims that the trial court abused its discretion when it prohibited the defense from introducing a prior consistent statement given by Ventura at Cooper's trial. Generally, however, a prior statement that is consistent with a witness's trial testimony is hearsay and is inadmissible to bolster that witness's credibility or to rehabilitate the witness when he has been impeached by a prior inconsistent statement. *People v. Randolph*, 2014 IL App (1st) 113624, ¶ 14. The admission of evidence is reviewed for abuse of the trial court's discretion and will be reversed only if the decision "was arbitrary, fanciful, or unreasonable, or no reasonable person would agree with it." *Randolph*, 2014 IL App (1st) 113624, ¶ 16.

¶ 76    In this case, to rebut the State's impeachment of Ventura, defense counsel sought to introduce the same testimony that Ventura gave at Cooper's trial, that he saw the driver return to the Impala and that the Impala's rear passenger door was open as the car drove away. The State objected stating that the previous testimony given by Ventura at Cooper's trial was an inadmissible prior consistent statement. Defense counsel argued that the "door was opened" when the State elicited testimony from Ventura on cross-examination. The trial court sustained the State's objection.

31

¶ 77    We find that the trial court did not abuse its discretion in denying defense counsel's request to admit the prior consistent statement because Ventura had testified on direct examination with regard to what he saw and any attempt to introduce the same statement again on redirect would simply have been bolstering of the witness.

¶ 78                            III. CONCLUSION

¶ 79    For the foregoing reasons, we affirm the judgment of the circuit court of Vermilion County.

¶ 80    Affirmed.